UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JEREMY SELBY,

      Plaintiff,

v.                              CASE NO: 8:07-cv-1619-T-23MSS

YACHT STARSHIP, INC., and
TROY MANTHEY,

      Defendants.

_____/

## ORDER

    Jeremy Selby (the "plaintiff") sues Yacht Starship, Inc., ("Starship"[1]) and

Starship's president and chief executive officer, Troy Manthey, under the Fair Labor

Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. (the "FLSA").  The plaintiff

alleges that the defendants violated 29 U.S.C. § 207(a)(1) by failing to pay the plaintiff

one and one-half times his regular rate of pay for each hour the plaintiff worked in

excess of forty per week.  Pursuant to Rule 56, Federal Rules of Civil Procedure, the

defendants move for summary judgment (Docs. 30, 43), and the plaintiff responds

(Docs. 34, 36) in opposition.  Although admitting that the plaintiff worked in excess of

forty hours during many workweeks and received no overtime pay,[2] the defendants

contend that the plaintiff was exempt from the FLSA overtime requirements under 29

U.S.C. § 213(b)(6) because he was "employed as a seaman."  Alternatively, the

_____

[1]  Apparently, Starship's actual name is Starship Cruise Lines LLC d/b/a Yacht Starship Dining Cruises.  See May 31, 2008, Declaration of Troy Manthey ("Manthey Decl.") ¶ 2.

[2]  Amended Joint Pretrial Stipulation (Doc. 45) ("Pretrial Stip.") ¶ 14(22).

defendants request partial summary judgment (i.e., a finding under Rule 56(d)(1)) that (1) liquidated damages under 29 U.S.C. § 216(b) are unavailable because in classifying the plaintiff as exempt the defendants acted in good faith and based on a reasonable belief that the classification complied with the FLSA and (2) the FLSA's normal two-year limitation (rather than the three-year limitation for "a cause of action arising out of a willful violation," 29 U.S.C. § 255(a)) applies because any violation occurred without either knowing or reckless disregard of the FLSA's requirements.  At a minimum, the defendants are entitled to the requested partial summary judgment because the plaintiff stipulates that (as to those issues) the pertinent facts are not in dispute.

## BACKGROUND

Starship operates dining and event cruises in and around Tampa Bay.[3]  When Starship employed the plaintiff, Starship operated two vessels, the 180-foot Yacht Starship and the 90-foot Lady Tampa Bay.[4]  The Starship vessels "made dining cruises for brunch, lunch, and dinner, as well as special event cruises for weddings, barmitzvas, and other special celebrations."[5]  Generally, Starship ran one or two cruises daily: a daily dinner cruise lasting about two and one half hours and (approximately every other day) a lunch cruise lasting about two hours.[6]  Typically, the Starship vessels "navigated throughout New Tampa Bay and Old Tampa Bay without voyaging beyond the Sunshine

---

[3]  Pretrial Stip. ¶ 14(1); Manthey Decl. ¶ 5; See also Feb. 14, 2008, Deposition of Jeremy Selby ("Pl. Depo.") at 15 ("[Starship Cruise Line is] a four-star dining yacht, a restaurant on the water.").

[4]  Manthey Decl. ¶ 5; Pretrial Stip. ¶ 14(3); May 8, 2008, Deposition of Darren John McClintock ("McClintock Depo.") at 23.

[5]  Manthey Decl. ¶ 5; see also Pretrial Stip. ¶ 14(2).

[6]  Pl. Depo. at 16, 22-23; see also Manthey Decl. ¶ 5.

Skyway Bridge into the Gulf of Mexico,"[7] and the cruises generally departed from and returned to a dock in the Channelside section of Tampa.[8]

Yacht Starship is registered with the United States Coast Guard (the "Coast Guard").[9] To legally operate and transport passengers on the water, Yacht Starship must maintain a certificate of inspection and a full marine crew.[10] The vessel and marine crew must pass an annual inspection and test by the Coast Guard.[11] To comply with applicable Coast Guard requirements, Starship staffs Yacht Starship with a marine crew comprising a captain, a first mate, two or three deck hands, and an engineer.[12] Each marine crew member wears a uniform that identifies his position on the crew through stripes and logos.[13] Starship classifies each marine crew member as exempt from overtime requirements under the FLSA's seaman exemption,[14] and Starship notifies each marine crew member when hired of the classification.[15]

---

[7]  Manthey Decl. ¶ 5; see also Pl. Depo. at 15-19.

[8]  Manthey Decl. ¶ 5; see also McClintock Depo. at 73 (stating that during McClintock's employment, the cruises invariably embarked and disembarked passengers at the same place).

[9]  Pretrial Stip. ¶ 14(5).

[10]  Pretrial Stip. ¶ 14(6).

[11]  Pretrial Stip. ¶ 14(6).

[12]  Pretrial Stip. ¶ 14(7).

[13]  Pretrial Stip. ¶ 14(8); see also Manthey Decl. ¶ 6; Gay Depo. at 62-63; Price Depo. at 23-24.

[14]  Pretrial Stip. ¶ 14(9).

[15]  Pretrial Stip. ¶ 14(10).  Starship's overtime policy, which is set forth in its employee manual, provides that "marine crewmembers are considered seaman . . . All marine crewmembers are exempt from getting overtime pay."  Pretrial Stip. ¶ 11.

The plaintiff worked for Starship and was classified by the defendants as a full-time marine crew member from June 6, 2003, to March 7, 2006.[16]  The plaintiff was hired as a deck hand; was promoted to assistant engineer on June 23, 2003, to engineer on May 24, 2004, and to chief engineer about June 20, 2005; and was discharged on March 7, 2006.[17]  During the pertinent period, the plaintiff served as engineer and chief engineer, and as a marine crew member he reported to the captain.[18]  The plaintiff generally served aboard the Yacht Starship (the "Starship") but occasionally assisted as a crew member on the Lady Tampa Bay.[19]

Accounts of the plaintiff's training for his duties as engineer are obscure or disputed or both.[20]  However, as engineer and chief engineer, the plaintiff's

---

[16]  Pretrial Stip. ¶ 14(12); see also Pl. Depo. at 15.

[17]  See Pl. Depo. at 13-14, 40, and Ex. 2 at 5-12.

[18]  Pretrial Stip. ¶¶ 14(14)-(15).

[19]  Pretrial Stip. ¶ 14(13); May 30, 2008, Declaration of Nick Guardalabene ("Guardalabene Decl.") ¶ 4; Manthey Decl. ¶ 13; see also Pl. Depo. at 10-15; McClintock Depo. at 23-24 (stating that after Starship acquired the Lady Tampa Bay in June, 2005, the plaintiff spent "[p]robably at least one day a week, maybe two" working aboard the Lady Tampa Bay); McClintock Depo. at 70 (stating that the plaintiff "really was not engineer of Lady Tampa Bay").

[20]  Nick Guardalabene, who from 2002 to 2006 was a captain in charge of the Starship marine crew, see Guardalabene Decl. ¶ 2, states that the plaintiff "underwent specific training required by the Coast Guard to act [as] a designated engineer for the Yacht Starship."  Guardalabene Decl. ¶ 14.  Guardalabene apparently refers to the requirement specified in the Starship certificate of inspection (Doc. 32-2), which states, "One deckhand must be designated in writing and receive special training in routine and emergency engineering skills and duties in accordance with the OCMI accepted company training program."  Jarrod Gay recalls receiving engineering training and completing an "Engineering Qualification Examination."  However, Gay asserts that the "qualification" was neither "real" (meaning, apparently, recognized by the U.S. Coast Guard) nor required by the pertinent maritime regulations.  Besides echoing Guardalabene's statement that the plaintiff underwent "specific training required by the Coast Guard to act [as] a designated engineer for the Yacht Starship," Manthey attaches what purports to be an "Engineer Qualification Training Package completed by Mr. Selby."  The undated attachment includes an overview describing Starship's engineer qualification program and documents the plaintiff's completion of the program under the inspection of Chief Engineer Kevin Welborn.  However, the plaintiff denies receiving "any training called engineer attendant training" or "any training that was required by the Coast Guard for employees who worked in the engine rooms of vessels."  Pl. Depo. at 44; see also Pl.
(continued...)

- 4 -

responsibilities included preventive maintenance[21] and very minor repairs[22] on the vessel's engine and mechanical systems.  Specifically, the engineer was required to perform preventive maintenance tasks appearing on engine room checklists and mechanical systems checklists.[23]  Manthey and Guardalabene state that the plaintiff generally performed the tasks enumerated on the checklists himself "but he had the ability to . . . delegate the duties to other crew members."[24]  However, the plaintiff insists that he shared these tasks equally or nearly equally with the deck hands.[25]  Accordingly, the plaintiff states that his promotion to engineer resulted in little change in his actual job duties,[26] that he performed no duties in the engine room not also performed by the deck

---

(...continued)

Depo. at 38.  McClintock states that although a formalized training program was not required by the pertinent maritime regulations, "we had a captain that was insistent on there being a more formalized program for engineer training, and the Coast Guard agreed" and that Starship accordingly developed an in-house training program.  McClintock speculates that the "Engineer Qualification Training Package" documents the program and prescribes the training a Starship engineer must complete "if they're going to be listed on the log as an engineer."  In any event, the plaintiff evidently was not required to be a licensed engineer.  See McClintock Depo. at 69 ("Generally if [a ship is] over 100 gross ton, your engineer is going to need to be licensed, which doesn't apply to Starship.").

[21]  Guardalabene Decl. ¶ 6; Manthey Decl. ¶ 14; Pl. Depo. at 53; McClintock Depo. at 17, 26-29; Price Depo. at 26-27, 34-35; Gay Depo. at 33, 46; "Amended Plaintiff's Statement of Disputed [sic] Facts" (Doc. 36) at 3.  The plaintiff's "Amended Plaintiff's Statement of Disputed Facts" is purportedly filed pursuant to a non-existent "Local Rule 56.1."

[22]  Pl. Depo. at 49, 57-58; Gay Depo. at 46-47; McClintock Depo. at 29.

[23]  Pretrial Stip. ¶ 14(16); Manthey Decl. ¶ 14; Guardalabene Decl. ¶ 5; McClintock Depo. at 17, 61; see also Pl. Depo. at 46, 61; Gay Depo. at 39.

[24]  Guardalabene Decl. ¶ 5; Manthey Decl. ¶ 14.

[25]  See Pl. Depo. at 45.

[26]  See Pl. Depo. at 40-41, 45-46, 48, 53.

hands, that he possessed no special skill or knowledge about the engine room,[27] and that he never helped repair the engine.[28]

In any event, despite their different job titles, the Starship's marine crew members worked as a team, performed many of the same tasks, and (apart from the general subordination to the captain) observed no rigid distinction among ranks.[29]  Accordingly, in addition to his engine room and mechanical system responsibilities, the plaintiff performed the types of general maintenance, monitoring, and cleaning duties performed by the deck hands on the marine crew.[30]  These deck hand duties, detailed on Starship's "Deck Hand Job Description" (Doc. 31-2 at 10-12), included (1) cleaning public areas, windows, doors, walls, closets, fixtures, and hallways; (2) vacuuming public areas and hallways; (3) cleaning public restrooms before, during, and after cruises; (4) cleaning mirrors, stools, sinks, toilets, floors, and door partitions, and restocking sanitary supplies; (5) emptying and replacing garbage bags in garbage receptacles and assisting in removing trash from the vessel; (6) inspecting door locks to

---

[27]  See Pl. Depo. at 40-41, 49; Price Depo. at 36.  But see McClintock Depo. at 24-25.

[28]  See Pl. Depo. at 44, 58.

[29]  See, e.g., Price Depo. at 17 ("[W]e was all like equal pretty much."); Price Depo. at 17 ("Well, we all pretty much done the same thing.'"); Price Depo. at 18 ("We were all pretty much just marine crew. It [a promotion] was just so you got an extra stripe or two.  That was about it."); Pl. Depo. at 27 (""[T]he deckhand, the engineer, first mate were all pretty much the same thing.  It wasn't anything different."); Pl. Depo. at 46 ("Assistant engineer, engineer, deckhand, we did every–everything was done the same."); Pl. Depo. at 40-41, 48, 52-53; Gay Depo. at 33 ("[W]e all did the same thing.  There wasn't no specific job duty there."); Gay Depo. at 47 ("[I]f one person did it, we all did it."); Gay Depo. at 69 (agreeing that the deck-hand position and engineer position were "largely interchangeable"); Gay Depo. at 10, 13, 15, 30, 48, 56, 72-73; McClintock Depo. at 17 ("The engineer had his own checklist . . . . And when that was done, it was his responsibility to jump in and then help out the marine crew, the deck hands, the senior deck hands, with whatever was needed . . . . The engineer would finish his engine room task, and then he would jump right in to helping clean the boat, whatever needed to be done."); McClintock Depo. at 26, 37. But see Price Depo. at 35.

[30]  Pretrial Stip. ¶ 14(17).

ensure they are in working order and alerting management to an unsecured or unsafe situation; (6) assisting in fuel supply and black water removal; (7) taking on potable water; (8) having a working knowledge of bridge equipment, alarms, and responses; (9) assisting in the receipt and delivery of supplies to storage areas; (10) assisting engineering with repair and maintenance of the vessel; (11) sharing responsibility for passenger safety at the gangway; (12) monitoring passengers and reporting unsafe conduct; (13) cleaning the navigation bridge; (14) inspecting safety chains; (15) washing and cleaning the exterior of the yacht, including windows and decks; (16) painting and maintaining the exterior of the yacht; (17) mooring the yacht; (18) establishing a gangway; (19) assisting the captain in the navigation of the vessel (e.g., calling out distances and informing the captain of the relative positions of other vessels); (20) providing assistance to other crew members and departments; (21) fulfilling "station bill"[31] requirements and participating in safety drills; and (22) "all other duties as assigned, requested or deemed necessary by management."

Although admitting the accuracy of this list,[32] the plaintiff describes his deck hand duties as consisting chiefly of "cleaning bathrooms, cleaning the hallway, boarding area chairs, floors, just general cleaning of the yacht"[33] and states, "Generally, that's all we

---

[31] The station bill is a list posted at approximately eight "stations" specifying the crew members, food & beverage managers, servers, bartenders, and galley managers' respective stations and duties in various emergencies (medical emergency, man overboard, fire, and "abandon ship"). See Price Depo. at 49, 61 and Ex. 4; Gay Depo. at 64 and Ex. 6; McClintock Depo. at 41-42.

[32] See Pl. Depo. at 26-27; see also Price Depo. at 38-39; Gay Depo. ay 17-18; Guardalabene Decl. ¶ 6; Manthey Decl. ¶ 14. But cf. McClintock Depo. at 30. The Pretrial Stipulation includes an abbreviated version of the list among the stipulated facts. See Pretrial Stip. ¶ 14(17). But see Doc. 45 ¶ 6(14) (objecting to the "Deck Hand Job Description" as hearsay).

[33] Pl. Depo. at 25.

did."[34]  Even as chief engineer, the plaintiff "considered [himself] a janitor."[35]  The

plaintiff spent about ninety percent of his work time aboard the vessel.[36]  However, the

plaintiff's duties ashore included cleaning the parking lot (which generally took five to ten

minutes every morning[37]), occasionally mowing (with a "weedeater") a small strip of

grass outside the dock, and performing odd jobs around the dock or in Starship's

offices.[38]  These odd jobs were generally shared by crew members, and not every crew

member performed them every day.[39]  Additionally, the plaintiff states, "I'd r[u]n to Home

Depot at least three times a week for light bulbs, cleaning, this, whatever, anything that .

. . pertain[ed] to the boat."[40]

---

[34]  Pl. Depo. at 25; see also Gay Depo. at 51-52 (describing the "[c]leaning side" of his job as engineer and marine crew member as "never ending"); McClintock Depo. at 12 (describing the deck hand position as "really a hospitality type of job . . . just a lot of cleaning, a lot of housecleaning"); McClintock Depo. at 47 (describing cleaning as crew members' "[m]ain responsibility").  But cf. McClintock Depo. at 35 (stating that during a cruise the marine crew members were "focused mainly" on their safety responsibilities).

[35]  Pl. Depo. at 14.

[36]  Pl. Depo. at 35-36, 45, 58-59; see also Price Depo. at 45 (estimating that the plaintiff spent "80 percent on the Starship, then the other 20 percent on the dock."); cf. McClintock Depo. at 48 (stating that the plaintiff "might have spent a couple of hours a week" working at the Starship's corporate office doing "handy-man type jobs").

[37]  See Pl. Depo. at 36.

[38]  See Pretrial Stip. ¶ 14(19); Pl. Depo. at 36-37; Guardalabene Decl. ¶ 6; Manthey Decl. ¶ 15; Gay Depo. at 16, 23.  Other Starship employees state that marine crew members' odd jobs ashore included (a) pressure washing the dock (a job generally taking between five hours and an entire day and performed approximately once a week by one of the deck hands), see Gay Depo. at 18-20, 73; (b) cleaning the boarding area (e.g., wiping down tables and chairs), see McClintock Depo. at 37; (c) about once a month, painting a small barge to which the yacht was moored (a job that took two deck hands about an hour and a half or two hours), see Gay Depo. at 24-26, 72-73; (d) rarely, woodwork or carpentry (making tables for the dining events), see Gay Depo. at 21-22; and (e) on one occasion (in which the plaintiff apparently did not participate), clearing brush from an embankment adjacent to the yacht, see Gay Depo. at 26-27; Manthey Decl. ¶ 15.

[39]  See Pl. Depo. at 37; Gay Depo. at 19, 23-24, 72-73; Price Depo. at 46; McClintock Depo. at 37; Guardalabene Decl. ¶ 6; Manthey Decl. ¶ 15.

[40]  Pl. Depo. at 89.

Occasionally, the plaintiff would also assist the food and beverage department in a staffing emergency by serving food or washing dishes for the duration of a cruise. The plaintiff estimates that this happened about once a month[41] or twenty times in three years.[42]  Similarly, Jarrod Gay, who was a marine crew member along with the plaintiff in approximately 2005 and 2006[43] and for part of that time a Starship engineer,[44] states that Gay and other members of the marine crew occasionally ("every once in a while") assisted the waiters and servers for half or three quarters of a shift.[45]  Darren McClintock, who was a Starship deck hand from about 2002 to 2004 and thereafter a mate until he became a captain (primarily for Starship's smaller yacht, the Lady Tampa Bay) around 2005,[46] states that (a) generally a deck hand's responsibilities included "hospitality" duties as well as marine duties; (b) the hospitality or "non-marine" duties consisted in assisting the food and beverage department; and (c) marine crew members spent about half their working time performing the non-marine or "hospitality industry duties."[47]  Jackie Price, who was a Starship crew member between 2004 and 2006,[48]

---

[41]   See Pl. Depo. 99-100.  The plaintiff appears to state that the plaintiff or another crew member assisted in serving and washing dishes about once a month.  However, the defendants (perhaps in deference to the summary judgment standard) interpret the testimony as stated in the text.  See Doc. 30 at 7 n.6; Doc. 43 at 3 n.2.

[42]   See Pl. Depo. 99-100.

[43]   See also Pl. Depo. at 37.

[44]   Gay Depo. at 33; see also Pl. Depo. at 81.

[45]   Gay Depo. at 69-71.

[46]   McClintock Depo. at 12, 24-25.

[47]   McClintock Depo. at 30-33; see also McClintock Depo. at 47 ("[W]e were called the marine crew, but when it came down to it we're still employed with Yacht Starship, the restaurant.  So when it comes down to it, we all have to pitch in whatever it is."); cf. McClintock Depo. at 74 (agreeing that the primary duty of both marine crew members and food and beverage staff concerned "the dining and the
(continued...)

states that (a) "almost every night" each marine crew member spent two hours or more[49] assisting the food and beverage staff in serving food, washing dishes, and performing similar galley duty; (b) "we were more servers than marine crew half the time";[50] and (c) Price observed the plaintiff assisting the food servers "almost every night."[51]  Moreover, according to Price, mid-level management (because "always short on their staff") asked and expected marine crew members to perform these duties.[52] The practice bothered Price because of the diversion of the marine crew from their primary responsibility–especially their responsibility to prevent passengers' falling overboard.[53]

Like other employees aboard the vessel (both marine crew members and food and beverage employees[54]), the plaintiff continually bore safety-related responsibility. For example, the plaintiff was responsible for:

> (1) preventing and treating fires, including having knowledge of fire systems on the boat; (2) knowing how to utilize life saving equipment; (3) understanding the vessel layout (including exists, egress areas, refuge areas, and muster areas); (4) knowing the safety procedures for boarding

---

[47](...continued)
enjoyment of the customers").

[48]  Price Depo. at 16-22, 32-33.

[49]  See Price Depo. at 54 ("two hours"), 54-55 ("almost two hours–half hour and a half, two hours"), 56 ("At least two hours").

[50]  Price Depo. at 58.

[51]  Price Depo. at 59.

[52]  See Price Depo. at 57-58.

[53]  See Price Depo. at 52-53, 67.

[54]  See McClintock Depo. at 32-33; Guardalabene Decl. ¶ 7; Manthey Decl. ¶ 16; Pl. Depo at 35.

and unboarding passengers; (5) knowing how to operate the emergency fuel shut off; (6) knowing safety procedures when using the "line"; and (7) knowing specific safety procedures and duties to be performed in the event of an emergency (as indicated on the station bill).[55]

Additionally, all employees aboard the vessel regularly participated in safety drills, signed "muster sheets" recording their participation, and completed "quizzes" testing their competence on various safety tasks.[56]

During the pertinent period, the plaintiff worked more than forty hours many weeks without receiving overtime pay.[57]  Finally, the parties stipulate (1) that in classifying the plaintiff as an exempt seaman under the FLSA the defendants acted in good faith and with a reasonable belief that the classification complies with the FLSA[58] and (2) that the plaintiff cannot prove that the defendants acted with "reckless disregard for the matter of whether its conduct was prohibited by" the FLSA and therefore the FLSA's two-year statute of limitations governs.[59]

---

[55]  Pretrial Stip. ¶ 14(18); see also Guardalabene Decl. ¶ 7; Manthey Decl. ¶ 16; Pl. Depo. 29-35; Gay Depo. at 55-60; Price Depo. at 47-49; McClintock Depo. at 39-43.

[56]  See Pretrial Stip. ¶¶ 14(20)-(21); Guardalabene Decl. ¶ 7; Manthey Decl. ¶ 16; Pl. Depo. at 73-77; Price Depo. at 49-52; Gay Depo. at 68; McClintock Depo. at 71-72.  Guardalabene and Manthey attach to their declarations "copies of safety 'quizzes' completed by Mr. Selby."  Guardalabene Decl. ¶ 7 and Ex. D ("Starship Safety System Quiz 1"); Manthey Decl. ¶ 16 and Ex. I ("Starship Safety System Quiz 1").  At his deposition, the plaintiff recalled taking no "safety quiz" and denied that the handwriting on the "Starship Safety System Quiz 1" was his.  However, the plaintiff inexplicably added that he had no reason to doubt the document's authenticity.

[57]  Pretrial Stip. ¶ 14(22).

[58]  Pretrial Stip. ¶¶ 14(23), 15(10).

[59]  Pretrial Stip. ¶ 15(12) (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (U.S. 1988)).

**DISCUSSION**

Summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The evidence and the available inferences are viewed most favorably to the non-moving party.  Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted).  The movant bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  If the movant is successful, the burden of production shifts to the non-moving party, who must offer "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not rest on the pleadings but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material issue remains.  Fed. R. Civ. P. 56(e)(2).  A scintilla of evidence supporting the non-moving party's position is insufficient: "there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The FLSA generally requires an employer to provide compensation for each hour worked in excess of forty at a rate of not less than one and one-half times an employee's regular rate.  See 29 U.S.C. § 207(a)(1).  However, the FLSA exempts "any employee employed as a seaman" from the Act's overtime pay requirements.  29 U.S.C. § 213(b)(6).  The FLSA does not define the phrase "employed as a seaman."  However, the pertinent Department of Labor ("DOL") interpretive bulletin, "Application of the Fair

Labor Standards Act to Employees Employed as Seamen," 29 C.F.R. pt. 783 (the "DOL

bulletin"), explains that ordinarily an employee is employed as a seaman for FLSA

purposes:

> if he performs, as master or subject to the authority, direction, and control
> of the master aboard a vessel, service which is rendered primarily as an aid
> in the operation of such vessel as a means of transportation, provided he
> performs no substantial amount of work of a different character.

29 C.F.R. § 783.31.  Additionally, the DOL bulletin states that an employee's eligibility

for the seaman exemption "depends upon the character of the work he actually

performs and not on what it is called or the place where it is performed."  29 C.F.R.

§ 783.33.[60]  Even if working aboard a vessel or occasionally performing seaman's

duties, a concessionaire, dredger, or stevedore is generally not employed as a seaman

in part because his services generally are not rendered primarily as an aid to operation

of the vessel as a means of transportation.  See 29 C.F.R. §§ 783.33-.34.  However, a

crew member such as a sailor, engineer, radio operator, fireman, purser, surgeon, cook,

or steward is generally employed as a seaman if, as in the usual case, his services are

rendered primarily as an aid in the operation of the vessel as a means of transportation.

29 C.F.R. § 783.32; Martin v. Bedell, 955 F.2d 1029, 1036 (5th Cir. 1992) ("A cook is

usually a seaman because he usually cooks for seamen.") (emphasis in original).

An employee employed as a seaman does not lose his exempt status "simply

because, as an incident to such employment, he performs some work not connected

with operation of the vessel as a means of transportation, such as assisting in the

---

[60]  See also Walling v. W.D. Haden Co., 153 F.2d 196, 199 (5th Cir. 1946) (noting that the words "any employee employed as seaman," 29 U.S.C. § 213(b)(6), "warn us to look to what the employees do, and not to rest on a mere matter of a name, or the place of their work.  The entire Act is pervaded by the idea that what each employee actually does determines its application to him.").

loading or unloading of freight at the beginning or end of a voyage, if the amount of such work is not substantial."  29 C.F.R. § 783.32; Martin, 955 F.2d at 1035-36 ("When a worker performs both seaman's work and nonseaman's work, he is a seaman unless his nonseaman's work is substantial in amount.").  The DOL bulletin states that an employee's non-seaman work  is "substantial" (and therefore excludes the employee from the seaman exemption) "if it occupies more than 20 percent of the time worked by the employee during the workweek."  29 C.F.R. § 783.37.

Because the DOL bulletin describes this twenty percent rule as the DOL's position "[f]or enforcement purposes,"[61] and because the Seventh Circuit omits to mention the rule in a recent opinion applying the seaman exemption, Harkins v. Riverboat Servs., Inc., 385 F.3d 1099 (7th Cir. 2004),[62] Starship contends that the twenty percent rule's applicability to private litigants remains unclear.  However, "courts faced with the difficult task of applying the FLSA's seaman exemption routinely rely on the DOL's 20% rule." Godard v. Alabama Pilot, Inc., 485 F. Supp. 2d 1284, 1295 (S.D. Ala. 2007).[63]  The

---

[61]  See 29 C.F.R. § 783.37 ("For enforcement purposes, the [DOL Wage & Hour Division] Administrator's position is that such differing work is 'substantial' if it occupies more than 20 percent of the time worked by the employee during the workweek.").

[62]  Harkins mentions the test in 29 C.F.R. § 783.31 (providing that a "seaman" is one who performs "service which is rendered primarily as an aid in the operation of [a] vessel as a means of transportation, provided he performs no substantial amount of work of a different character") but concludes that "this just means that the employee must be a (more or less) full-time member of the marine crew, that is, the crew that is responsible for operating the ship."  Harkins v. Riverboat Servs., Inc.,  385 F.3d 1099, 1104 (7th Cir. 2004).

[63]  See also Martin v. Bedell, 955 F.2d 1029, 1036 (5th Cir. 1992); Worthington v. Icicle Seafoods, Inc., 796 F.2d 337, 338 (9th Cir. 1986); Meliton v. Wepfer Marine, Inc., No. 05-2184, 2006 WL 1745049, *3 (W.D. Tenn. June 19, 2006).

DOL's reasonable construction of the statute is entitled to <u>Chevron</u> deference[64] and to particular deference because, although the DOL added the twenty percent rule to the interpretive bulletin in 1948[65] and Congress has since revised the seaman exemption in certain respects, Congress has not changed the DOL's interpretive definition.[66]

In short, the twenty percent rule determines a worker's qualification for the seaman exemption.[67]  However, the rule is not applied in a mechanical manner. Because the amount of non-seaman's work an employee performs may vary from week to week:

> [i]n a given week, a crew member may, <u>without</u> any change in basic assignment or position, spend more than 20 percent of his time performing nonseaman's work.  This should not mean that the crew member loses his seaman status for that week, and in such a case the crew member should

---

[64]  See <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984); <u>Falken v. Glynn County, Georgia</u>, 197 F.3d 1341, 1346 (11th Cir. 1999); <u>Patel v. Quality Inn South</u>, 846 F.2d 700, 703 (11th Cir. 1988); <u>see also</u> <u>Martin</u>, 955 F.2d at 1035; <u>Dole v. Petroleum Treaters, Inc.</u>, 876 F.2d 518, 521 (5th Cir. 1989).

[65]  See 13 Fed. Reg. 1376-77 (Mar. 17, 1948); <u>Petroleum Treaters</u>, 876 F.2d at 522 n.6 (citing Interpretative Bulletin No. 11, Wage and Hour Administration, U.S. Department of Labor (Mar. 1948)).

[66]  See <u>Petroleum Treaters</u>, 876 F.2d at 522; <u>Lorillard v. Pons</u>, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[67]  <u>Harkins v. Riverboat Services, Inc.</u>, 385 F.3d 1099, 1103 (7th Cir. 2004) recognizes a rebuttable presumption that a person who is a seaman under the Jones Act is also "employed as a seaman" under the FLSA.  But see <u>W. D. Haden Co.</u>, 153 F.2d at 198; <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit decisions of the former Fifth Circuit announced before October 1, 1981); <u>see also</u> <u>Petroleum Treaters</u>, 876 F.2d at 520 (concluding that "prior precedent, the Department of Labor's interpretations of the FLSA, the legislative histories and purposes of the statutes, and the structure and wording of § 13 of the FLSA" compels the conclusion that "the definitions of seamen under the two acts are separate and independent of each other"); <u>Pac. Merchant Shipping Ass'n v. Aubry</u>, 918 F.2d 1409, 1412 (9th Cir. 1990); <u>Sternberg Dredging Co. v. Walling</u>, 158 F.2d 678, 680-81 (8th Cir. 1947); <u>Godard</u>, 485 F. Supp. 2d at 1294 n.21 (concluding that <u>Harkins</u> "conflicts with the recognition by other appellate courts that the term 'seamen' has different meanings in the two statutes, makes no allowance for the drastically different remedial purposes of the FLSA and the Jones Act, and fails to square the existence of such a presumption with congressional intent.").

remain a seaman unless, as a <u>general</u> matter, a substantial portion of his time was taken up by nonseaman's work.

<u>Owens v. SeaRiver Mar., Inc.</u>, 272 F.3d 698, 702 n.5 (5th Cir. 2001) (emphasis in original); <u>see also</u> <u>Godard</u>, 485 F. Supp. 2d at 1296.  Determining a worker's qualification for the seaman exemption "calls for an examination of the nature of the work actually performed by the employees and of the comparative amount of seamen versus nonseamen duties."  <u>Dole v. Petroleum Treaters, Inc.</u>, 876 F.2d 518, 522 (5th Cir. 1989).  Finally, an employer bears the burden of proving that an employee falls within the seaman exemption, which is narrowly construed.  <u>See</u> <u>Hogan v. Allstate Ins. Co.</u>, 361 F.3d 621, 625 (11th Cir. 2004).[68]

The summary judgment record presents no dispute (a) that during the pertinent period the plaintiff was a member of the Starship marine crew subject to the authority, direction, and control of the vessel's master, or (b) that in his capacity as engineer, chief engineer, and marine crew member the plaintiff rendered services "primarily as an aid in the operation of [the] vessel as a means of transportation."  The remaining question is whether the record presents a triable issue as to whether the plaintiff's position generally required him to spend more than twenty percent of his time performing non-seaman's work.  The question cannot be answered by testimony directly contradicting the plaintiff's testimony because on summary judgment:

> [w]hen the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the

[68]  <u>See also</u> <u>Avery v. City of Talladega, Ala.</u>, 24 F.3d 1337, 1340 (11th Cir. 1994) ("We construe overtime exemptions narrowly, against the employer.").

> facts evidenced by the parties, we credit the nonmoving party's <u>version</u>.
> Our duty to read the record in the nonmovant's favor stops short of not
> crediting the nonmovant's testimony in whole or part: the courts owe a
> nonmovant no duty to disbelieve his sworn testimony which he chooses to
> submit for use in the case to be decided.

<u>Evans v. Stephens</u>, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis in original).[69]

Under <u>Evans</u>, the plaintiff's testimony that he assisted the food and beverage department by serving food or washing dishes about once a month or twenty times in three years is credited on summary judgment.[70]  Although the plaintiff was asked to give and gave an estimate, the estimate is so entirely inconsistent with Price's testimony that "almost every night" each marine crew member (including the plaintiff) spent about two hours assisting the food and beverage staff in serving food, washing dishes, and performing similar galley duty that Price's version must be disregarded.  Similarly, the plaintiff's account is irreconcilable with McClintock's testimony that marine crew members spent about half their working time assisting the food and beverage department–at least if "assisting the food and beverage department" is not interpreted so broadly (<u>e.g.</u>, as including general cleaning of the vessel) that it becomes meaningless.  Under <u>Evans</u>, the plaintiff's version controls.  According to that version, assisting the food and beverage department by washing dishes, serving food, and

---

[69]  <u>See also</u> <u>Evans v. Stephens</u>, 407 F.3d 1272, 1283-84 (11th Cir. 2005) (Carnes, J., concurring) (agreeing that "for summary judgment purposes we accept a non-movant's own testimony warts and all, instead of snipping from that testimony the parts that are less favorable than what some other witness says," and explaining, "[T]he good reason is that, absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case.  Reasonable juries know that is not how human nature, influenced by self-interest, works.  And when we decide whether summary judgment is warranted, we view the evidence in the non-movant's favor, but only to the extent that it would be reasonable for a jury to resolve the factual issues that way."); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1272 (11th Cir. 2004); <u>Sullivan v. City of Satsuma</u>, No. Civ.-A-04-0473-WS-M, 2005 WL 2895983, 2-3 (S.D. Ala. Oct. 28, 2005).

[70]  <u>See</u> Pl. Depo. 99-100.

performing similar galley duty occurred infrequently and generally formed an

insignificant portion of the plaintiff's duty.

Similarly, under Evans, the plaintiff's testimony that he spent about ninety percent

of time performing duties aboard the vessel controls.  The plaintiff states that the bulk of

that time was devoted not to his engineering duties (which are plainly seaman's

duties[71]) or to monitoring passenger safety ("making rounds," which, as McClintock

correctly states, "is a marine duty because it goes to the safety of the vessel"[72]), but to

"general cleaning of the yacht."[73]  However, although undoubtedly improving

passengers' dining experience, the plaintiff's general cleaning duties were necessary to

the safe and efficient operation of the vessel and therefore qualify as seaman's duties,

i.e., as service rendered primarily as an aid in the operation of the vessel as a means of

transportation.[74]  As one of the Starship captains states, "the cleanliness of the boat . . .

is obviously a safety factor."[75]  Indeed, the plaintiff appears to concede the point by

agreeing that "[m]embers of the operating crew of a vessel who perform general

---

[71]  See 29 C.F.R. § 783.32 ("The term 'seaman' includes members of the crew such as . . . engineers . . . if, as is the usual case, their service is of the type described in § 783.31."); cf. 29 C.F.R. § 783.35.

[72]  McClintock Depo. at 32; cf. McClintock Depo. at 16.

[73]  Pl. Depo. at 25.

[74]  See Tate v. Showboat Marina Casino P'ship, 357 F. Supp. 2d 1075, 1084 (N.D. Ill. 2005) (concluding that cleaning and replacement of ceiling tiles intended to maintain the safety of a ship were seaman's duties under the FLSA); cf. Harkins, 385 F.3d at 1104 ("A ship is a means of transportation, and even when it is docked the marine crew is responsible for its safe and efficient operation and maintenance-for keeping it afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, preventing fires, etc.  All this is maritime work, and the members of the ship's crew who do it . . . are seamen even during the intervals in which the ship is moored."); Godard, 485 F. Supp. 2d at 1300 (concluding that launch operators' "janitorial . . . and cleaning functions" performed ashore in and around a pilot station had no reasonable connection to seamen's work, but stating in dicta that "[t]he same may not be true if they were performing such functions aboard a vessel at sea.").

[75]  McClintock Depo. at 16.

maintenance and cleaning duties on the vessel engage in seaman work when performing such duties."  Pretrial Stip. ¶ 15(8).

The plaintiff spent the remaining ten percent of his work time performing duties ashore–cleaning the parking lot (which generally took five to ten minutes every morning), mowing the small strip of grass outside the dock, performing odd jobs around the dock or in Starship's offices, and going to Home Depot for "anything that . . . pertain[ed] to the boat."  Some of these duties (e.g., the landscaping and parking lot cleaning)[76] were plainly not rendered primarily as an aid in the operation of the Starship as a means of transportation.  Other tasks marine crew members performed ashore (e.g., painting the barge to which the Starship was moored, and which evidently secured the gangway[77]) may reasonably be described as primarily in service of the safe and efficient operation of the vessel.  However, classifying them is unnecessary because the plaintiff states that he spent only ten percent of his time in performing these duties.[78]  Accordingly, the undisputed facts demonstrate that during the pertinent period, the plaintiff (a) performed services, subject to the authority, direction, and control of the master aboard a vessel that were rendered primarily as an aid in the operation of the vessel as a means of transportation and (b) performed no substantial amount of work (i.e., not more than twenty percent of his work time as a general matter) of a different character.  In short, the summary judgment record presents no triable issue as to

---

[76] See Godard, 485 F. Supp. 2d at 1300 (concluding that "[l]aunch operators are clearly not rendering service primarily as an aid in the operation of their vessel as a means of transportation when they are . . . performing landscaping services, or engaged in similar tasks at the building and grounds adjacent to the dock.").

[77] See Gay Depo. at 25.

[78] Pl. Depo. at 35-36, 45, 58-59.

whether the plaintiff was "employed as a seaman" within the meaning of 29 U.S.C. § 213(b)(6).

## CONCLUSION

The defendant's motion for summary judgment (Doc. 30) is **GRANTED**.  The Clerk is directed to enter judgment against the plaintiff Jeremy Selby and in favor of the defendants Yacht Starship, Inc., and Troy Manthey.

ORDERED in Tampa, Florida, on August 20, 2008.

_____
**STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**